IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| S.L., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) |
| LONE JACK C-6 SCHOOL DISTRICT | ) JURY TRIAL DEMANDED |
| and DR. MATTHEW TARWATER, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

COMES NOW Plaintiff S.L., by and through undersigned counsel, and hereby files the

following Complaint against Defendants as captioned above.

## INTRODUCTION

1.      The School District's former Superintendent Dr. Matthew Tarwater is a sexual

predator who serially preyed on female students, including S.L.  Tarwater used his position to

identify vulnerable students, isolate his victims, and subject them to various emotionally and

psychologically abusive behaviors, which he methodically employed to manipulate and control

S.L. even beyond her graduation. Tarwater himself confessed "I have these demons, and I look for

kids that are needed, and I concentrate on them, as it keeps me from thinking about my problems."

For years, School Board President Kellie Roth, High School Principal Kathy Butler, and others in

the District turned a blind eye to Tarwater's creepy conduct toward certain female students, which

brazenly violated school policies.  Further, they deliberately failed to investigate or take remedial

action notwithstanding reports and complaints about Tarwater's conduct, and actively assisted

Tarwater in covering up his misconduct including by tipping him off to complaints.  Ominously,

when eventually confronted by S.L.'s parents, Tarwater confessed he lived in fear of waking up to

find his face on TV or "opening his front door to an angry dad," indicating Tarwater not only knew the seriousness and scope of his wrongdoing but also that S.L. was not his only victim.

## JURISDICTION AND VENUE

2.       Plaintiff brings this action to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and to redress the deprivation of constitutional rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

3.       This Court has original jurisdiction of the federal questions presented herein pursuant to 28 U.S.C. §§ 1331, which confers on district courts subject matter jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

4.       This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

5.       Plaintiff further asserts causes of action under Missouri law over which the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), because Plaintiff's causes of action under Missouri law are so related to the federal questions over which this Court has original jurisdiction as to constitute the same cause of controversy.

6.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since all defendants reside or resided in this district and the events giving rise to the claims occurred in this district.

2

## THE PARTIES

7.    Plaintiff S.L. is now an adult resident of Clay County, Missouri. Prior to 2019, S.L. resided with her father and step-mother in Jackson County, Missouri.

8.    Defendant Lone Jack C-6 School District ("School District" or "LJSD") is and was at all relevant times a public school district located in Jackson County, Missouri, within the geographic areas encompassed by the Western District of Missouri.

9.    Until 2017, Defendant Dr. Matthew Tarwater ("Tarwater") was employed by the School District as principal of Lone Jack High School ("LJHS"), at which time he was promoted to the position of superintendent. At all relevant times, Tarwater's actions as alleged herein were taken under color of state law and within the course and scope of his employment. He is sued in his individual and official capacities.

10.    Before being hired by LJSD, Defendant Matthew Tarwater was employed by the Harrisonville R-9 School District as a middle school history teacher from 2006 through 2012. For the years 2007 through 2012, Tarwater also coached Eighth Grade girls' basketball in Harrisonville. For reasons not apparent, Harrisonville R-9 School District accepted Tarwater's resignation in or about December 2012.[1] This was unusual because teacher contracts are typically renewed annually for a full year term. After being released by Harrisonville, LJSD hired Tarwater to be its high school principal. This was also unusual because, upon information and belief, Tarwater was relatively young and had no prior administrative experience.

---

1.  Under Missouri law, Tarwater had gained permanent teacher status (i.e., tenure) prior to his last year at Harrisonville. See Mo. Rev. Stat. §168.104. Minutes of a December 20, 2011 closed meeting of the Harrisonville School Board indicate the School Board accepted Tarwater's resignation and approved a separation agreement which further required Tarwater to pay a penalty assessment of $6,000.00. Upon information and belief, the penalty was assessed under Harrisonville School Board Policy GCPB, which provides: "Because the district will incur substantial expense in seeking replacements, any certified personnel under contract . . . [o]n all resignations submitted on or after August 1 for the current contract year, such resignation shall be accompanied by $6,000 in check or good funds."

3

11.     Following the events detailed below, LJSD accepted Tarwater's resignation in or about December 2019.  Upon information and belief, LJSD provided Tarwater a 7-day option to resign in lieu of being fired as a result of S.L.'s and others' allegations about Tarwater's emotional, psychological and sexual abuse.  The District purports to have completed an independent investigation concerning Tarwater's misconduct in December 2019, but refuses to share its investigator's report or findings with S.L. despite promising an "outcome letter" would be issued after the School Board's regular January 13, 2020 meeting.  The District also refuses without explanation to ensure it will report to any potential future school employer Tarwater's departure was a result of allegations of sexual misconduct.

## FACTS COMMON TO ALL COUNTS

### JANUARY 2013: S.L. ENROLLS AT LJHS

12.     In January 2013, S.L. enrolled as a sophomore at LJHS after transferring from another nearby school district.

13.     Prior to transferring to LJHS, S.L. and her twin sister resided part-time with their birth mother, who subjected them to emotional and psychological abuse, including, for example, telling the girls their behavior was driving her to contemplate suicide.  Unable to endure this abuse, S.L. and her sister moved in full-time with their father and stepmother.

14.     As a transferring student, S.L.'s school records from her prior school were provided to LJHS, making personal information concerning the reasons for her transfer readily accessible to school administrators, including Tarwater, who learned intimate details concerning S.L.'s abusive home life and deeply troubled relationship with her mother.

4

## TARWATER'S PREDATORY SEXUAL GROOMING

15.     Sexual predators commonly use a series of psychological and emotional abuse tactics to coerce a victim into a sexual relationship, a process that may take place over an extended period of time and which is known as predatory sexual grooming. *See* Georgia M. Winters & Elizabeth L. Jeglic (2017)*, Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters, Deviant Behavior*, 38:6, 724, 725 (2017).

16.     "Empirical research has found that nearly half of the offenders who commit sexual acts against children utilize what are known as grooming behaviors." *Id*.; *see also* R. Fossey & T. Mitchell, *Title IX's "Deliberate Indifference" Standard for Determining School Liability Under Title IX When Students Are Sexually Abused by School Employees: A Trust Betrayed*, 299 Ed. L. Rep. 811, 814 (2014) (noting that it is well-established "in the research literature that abusers often develop inappropriate sexual relationships with students through a 'grooming' process whereby the abuser first breaks down verbal boundaries with his victim through inappropriate conversations about sex before moving on to violating physical boundaries.")

17.     Predatory sexual grooming is a preparatory process in which a sexual predator acts methodically and over time to:  (a) target a victim; (b) secure regular access to the victim while at the same time gradually isolating her/him from others; (c) gain the victim's trust, and (d) use the trust and isolation to control and conceal the relationship, often with the assistance of the victim. "Abusive educators often 'groom' their students by treating them in a special manner: starting slowly and building their trust and increasing their attachment and vulnerability.  Isolation of the student and guilt are often part of the grooming process.  Signs of grooming may include inordinate amounts of attention being paid to a student, sexual comments and innuendos directed at students, pulling the student from classes for private meetings, giving gifts, inappropriate touching (sitting

on the teacher's lap, hugging, stroking, etc.)." Fossey & Mitchell, 299 Ed. L. Rep. at 839-40 (2014).

18.     Sexual predators skillfully employ these predatory sexual grooming tactics to manipulate a child so that sexual abuse can be more easily committed.  Winters & Jeglic, *Deviant Behavior*, 38:6 at 724-25. Sexual predators employ these tactics while "keeping a guise of being kind, charming, and helpful. They strategically manipulate the victim, their family, and the community to hide their deviant intentions and avoid detection. These behaviors include strategies such as selecting a vulnerable victim, gaining access to the child, developing trust, and desensitizing the victim to touch."  *Id.* (citations omitted).

19.     Victims of grooming are typically unaware they are being manipulated and do not consciously perceive the perpetrator's conduct is inappropriate, but may nonetheless lie to peers or family members or take other steps to conceal their relationship with the perpetrator.  *Id.*

20.     Importantly, exposure to predatory sexual grooming tactics is alone sufficiently traumatic to inflict lasting psychological injury on the victim.  Peer-reviewed studies have found that it is "not only the experience of sexual abuse (or even the severity of such abuse) that determines the severity of trauma symptoms in survivors, but also the grooming experience. Each of the three methods that the perpetrators used to coerce their child victims into the sexual abuse added to the overall trauma experience for the survivors in this study."  Molly R. Wolf & Doyle K. Pruitt, *Grooming Hurts Too: The Effects of Perpetrator Grooming Types on Trauma Symptoms in Adult Survivors of Child Sexual Abuse*, J. of Child Sexual Abuse (March 25, 2019).

21.     Part of the reason predatory sexual grooming is effective is because it plays on a victim's emotional vulnerabilities. A perpetrator will develop intimacy with a victim whereby the

6

victim discloses secret, often shameful information. In turn, a perpetrator will use that information to later exploit the victim, use it against her, and further manipulate the victim.

## TARWATER TARGETS AND BEGINS TO ISOLATE S.L.

22. As detailed further below, during S.L.'s first semester as a LJSD high school student, Tarwater targeted S.L. with these predatory tactics, all along having the goal of coercing S.L. into sex.

23. On S.L.'s second day at LJHS, while attending Mr. Ron Hankins' computer class, Tarwater entered the classroom, spoke with her teacher and escorted her into the hallway where he introduced himself as the school principal. S.L. had never met Tarwater and was concerned why the school principal would single her out and pull her from class.[2]

24. Tarwater's purported reason for pulling S.L. from class was to welcome her to LJHS. But then he claimed to empathize with her situation because he too was "new" to the District, having been principal for less than a year.

25. The first step in the predatory sexual grooming process is the selection of a victim, which can be based on appeal attractiveness, ease of access, or perceived vulnerabilities of the child. More specifically:

> [C]hild molesters are also found to target children based on family situations, such as those living in single family households as often in these cases children may have less adult supervision or the custodial parent may rely upon others to help with childcare responsibilities. *Further, children who have families with alcohol or drug addictions, emotional or mental problems, marital discord, domestic violence issues, or that are neglectful are at higher risk for sexual abuse as these situations may also lead to less parental supervision. The offender may also seek children with perceived psychological vulnerabilities that would allow the child to be more easily isolated from others, such as low self-esteem, low confidence, insecurity, neediness, or naivety.*

---

2. Tarwater's pattern of blatantly violating district policies governing staff/student relations thus began on the very day he introduced himself to S.L. District Policy GBH (14) expressly prohibits school personnel from "pulling a student from another class or activity to be with the staff member."

7

Winters & Jeglic, Deviant Behavior, 38:6 at 725 (emphasis supplied).

26.     After targeting S.L., Tarwater sought to engage her with steadily increasing frequency.  He encouraged her to talk about personal matters including the abuse she suffered at the hands of her birth mother, as well as her depression and anxiety, telling her he could relate to her because he also purportedly struggled with depression and had a difficult childhood.[3]  He invited her to confide in him whenever she needed and offered that his door was always open to talk. This and related conduct was inappropriate under District Policy GHB, and consistent with the second stage of grooming in which the predator gains access to and begins isolating his victim.

27.     The second stage of the predatory sexual grooming process "involves the child molester gaining access to the potential victim, with the goal of isolating the child both physically and emotionally from those around them." WINTERS & JEGLIC, DEVIANT BEHAVIOR, 38:6 at 726; see also R. Fossey & T. Mitchell, *Title IX's "Deliberate Indifference" Standard for Determining School Liability Under Title IX When Students Are Sexually Abused by School Employees: A Trust Betrayed*, 299 Ed. L. Rep. 811, 814 (2014) ("Abusive educators often 'groom' their students by treating them in a special manner: starting slowly and building their trust and increasing their attachment and vulnerability. Isolation of the student and guilt are often part of the grooming process. Signs of grooming may include inordinate amounts of attention being paid to a student, sexual comments and innuendos directed at students, pulling the student from classes for private meetings, giving gifts, inappropriate touching (sitting on the teacher's lap, hugging, stroking, etc.)."  Most survivors report that the emotional isolation and control employed by the perpetrator is more impactful, and more traumatizing, than the physical or sexual abuse it precedes.

---

3.  District Policy GBJH (7) forbids school staff from "[d]iscussing the staff member's personal problems with or in the presence of students."

8

## TARWATER ESCALATES HIS PREDATORY TACTICS

28.     Throughout her high school career, Tarwater methodically escalated his predatory tactics which were designed to gain S.L.'s trust and establish a close emotional bond.  He often inappropriately shared with S.L. confidential information concerning the District, school personnel and other students.

29.     For example, Tarwater shared confidential information about the School District's legal affairs and discussed with S.L. a pending lawsuit by an LJHS student named Taylor Trask who, upon information and belief, alleged she was subjected to sexual harassment in school and that Tarwater and then-superintendent Bryan Pruitt failed to investigate and adequately address Trask's complaints. Tarwater revealed to S.L. he was worried about the case and later disclosed to S.L. that the District had decided to settle.

30.     The third step in the predatory sexual grooming process involves the emotional recruiting of the victim to develop trust. "This step is often regarded as the central role of the grooming process, wherein the offender establishes trust and cooperation with the victim." WINTERS & JEGLIC, DEVIANT BEHAVIOR, 38:6 at 726.  "The offender accomplishes this by be-friending the child, by learning about his/her interests, being helpful, showering the child with gifts and attention, or sharing secrets." *Id*.

31.     By the start of S.L.'s junior year in 2013, Tarwater's predatory tactics had escalated to physical touching, including rubbing her shoulders, patting her back, and multiple "side hugs" each day.  This type of conduct was not isolated, but would occur throughout the school day. It occurred with particular frequency after athletic events in which S.L. competed, where Tarwater was able to disguise his inappropriate touching as a merely an expression of praise or encouragement.  Similarly, whenever S.L. confided personal information in him or appeared upset,

he would use the opportunity to initiate physical contact as a purported means of "consoling" her. Even one instance of such physical contact is expressly prohibited by District policies.

32. The fourth stage of the grooming process involves "gradually increas[ing] physical contact in order to desensitize the child to touch." WINTERS & JEGLIC, DEVIANT BEHAVIOR, 38:6 at 727. "Often times this begins with seemingly accidental touch or innocent behaviors, which then escalate to more intimate touching. For example, the child molester may first give the child hugs or pats on the back, and then gradually escalate to wrestling, tickling, or back massages and the eventual sexual contact." *Id*.

33. Because of Tarwater's grooming and his position of authority, S.L. came to view Tarwater as a "father figure," and she did not perceive his methodical escalation of "innocent touching" to be inappropriate, nor was she aware that she was gradually becoming desensitized to physical contact from which Tarwater derived sexual gratification—which is, of course, exactly the result Tarwater intended to accomplish.

34. Notably, child sex predators "often seek jobs that involve contact with children like teachers, camp counselors, bus drivers, or coaches. Those who establish themselves in professional settings may create reasons to see the child after school hours or offer to take them on outings." WINTERS & JEGLIC, DEVIANT BEHAVIOR, 38:6 at 726. These activities typically exclude other adults, in an attempt to get the child alone engage her in communication. *Id*. Frequently, male offenders attempt to assume the role of a "father figure" for the child. *Id*.

35. S.L. began her senior year in August 2014, at which time Tarwater's physical touching escalated even further to include shoulder massages, full frontal hugs, full frontal hugs where he would lift her off the ground, and taking her hand to spin her around in a pirouette.

36.     "Special treatment" is a classic predatory tactic.  During S.L.'s senior year, Tarwater escalated the special privileges he bestowed on S.L., frequently allowing her to skip class, freely walk the halls, leave school premises, and "hang out" in his office.  All of these special privileges at the same time provided Tarwater with the opportunity to interact and be alone with S.L.  Tarwater would regularly join S.L. in walking the halls and spending time alone in his office.

37.     Tarwater did not bestow similar freedoms to the same extent on any other students, male or female. This too violated district policies. *See* District Policy GBH (12) (prohibiting staff from "allowing any student to engage in behavior that would not be tolerated if done by other similarly situated students").

38.     As the direct result of Tarwater's grooming, each school year S.L. became increasingly isolated from her family and friends emotionally and psychologically.  She suffered from increasing depression, anxiety and low self-esteem and began seeing a therapist.

39.     S.L.'s emotional and psychological isolation worsened as Tarwater sought to impose himself as her exclusive social and emotional relationship. During her junior and senior years at LJHS she never had a boyfriend or dated.

40.     When she did engage with her peers, S.L. made Tarwater the focus.  She would often tell people that "we've gotten very close" and seemed to only want to talk about Tarwater, around whom her high school experience now revolved.  For example, when organizing the annual "senior prank" for her class, S.L. insisted that Tarwater be the "target," which involved filling his office with hundreds of balloons. After the prank, Tarwater sought out S.L. and "caught" her by placing her in a headlock and walking her down the hall.

41.     Tarwater's conduct toward S.L. did not go unnoticed. During the course of her senior year, S.L.'s brother and twin sister (who also attended LJHS) observed and grew suspicious

of Tarwater's treatment of S.L., the amount of time she was spending with him, and the fact that she was constantly talking about him to others. Both siblings could see there was "something weird" about how Tarwater treated S.L.

42.     Before S.L. graduated, Tarwater's predatory tactics had become so open and obvious that others, including high school staff and other administrative personnel, noticed as well.

43.     S.L. graduated from LJHS on May 18, 2015. That night, LJHS held its annual "Grad Night" at the high school gymnasium.

44.     Toward the end of the evening on Grad Night, Tarwater invited S.L. to his office. Upon isolating her in his office, Tarwater embraced S.L. in a full frontal hug, lifted her off her feet and kissed her on the forehead, all acts from which Tarwater derived sexual gratification.

45.     All along, Tarwater had also planned to continue his predatory sexual grooming of S.L. after graduation.

46.     Beginning in her junior year, Tarwater frequently urged S.L. to join him on the next trip abroad to Europe scheduled for summer 2016. LJSD and Harrisonville School District jointly sponsored a semi-annual student tour abroad through EF Educational Tours. The trips were organized and led by Tarwater and chaperoned by faculty and parents from both high schools.

47.     Prior to graduation, Tarwater gave S.L. a personal note which read: "[S.L.], I'm not sure where to start. You have somehow become someone that I rely on to make my days better here. You are such an amazing person that I can't wait to see what you do with your life in the coming years. Thank you so much for all that you have done around here to make this a better place. I'm going to miss you."

12

48. In early June 2015, just two weeks after graduation, Tarwater "friended" S.L. on Facebook. He also created a Twitter account that summer to use as another means of continuing to communicate with S.L.

49. Around the same time, Tarwater convinced S.L. to join the upcoming school-sponsored trip abroad, despite knowing S.L.'s parents did not want to her go and that she would have to pay for the trip herself.

50. "Testing" is another classic grooming strategy where, by encouraging the victim to disobey the wishes of parents or taking the victim's side against parents, the perpetrator is able to test his influence over the victim and the likelihood that the parents will intervene.

51. During the same time frame, Tarwater manipulated S.L. into beginning to run and work out with him, activities that continued throughout the summer. These workouts would occur most often at the LJHS track and would include "ab" exercises involving planks, crunches and stretching where Tarwater would be in close proximity to and able to initiate physical contact with S.L.. Tarwater used Facebook to arrange these workouts and he would often comment about the workout via Facebook afterward.

52. On one occasion, Tarwater called S.L.'s parents to emphasize he was only helping S.L. train. Because of his position as Superintendent, he was able to persuade S.L.'s father and step-mother that this was the extent of the relationship.

53. Beyond manipulating their victim, sexual predators also endeavor to gain the trust of the victim's family. This is accomplished through the creation of an erroneous identity and the fabrication of a sense of friendship, responsibility, care, and trustworthiness in interpersonal relationships and role assignments (i.e. teacher, coach, neighbor helping with carpooling). *See* 'SETTING 'EM UP': PERSONAL, FAMILIAL AND INSTITUTIONAL GROOMING IN THE SEXUAL ABUSE OF

CHILDREN, Social & Legal Studies, 15(3), 339–62 (2006). In turn, the sexual predator works toward developing a positive reputation that, if challenged by an accusation of abuse, stands up to scrutiny. If the sexual offender is in a position of power in an institution, this reputation, along with the power differential the sexual offender has over the victim and established reputation makes disclosure (and belief of disclosure) improbable. *Id.*

54. In the fall of 2015, S.L. enrolled at Northwest Missouri State as a freshman. Tarwater continued to seek out meetings with S.L. when she was home on breaks or weekends, and during these encounters he continued initiating physical contact as before.

55. When S.L. returned home for the summer in 2016, Tarwater manipulated her into resuming workouts together and running at every opportunity. However, at Tarwater's insistence, these workouts moved to a more private location at Legacy Park in Lee's Summit.

56. Tarwater maintained pressure on S.L. to conceal from or lie to her parents and others regarding the nature and extent of their contacts. For example, Tarwater asked S.L. if her parents knew they were working out together. When she replied "no," Tarwater told her "then we should probably keep it that way," explaining that "people might think it's weird."

## FIRST LONE JACK HIGH SCHOOL TRIP ABROAD

57. In the summer of 2016, as he had planned, Tarwater used the school-sponsored trip abroad to escalate his predatory grooming of S.L.

58. Before leaving, Tarwater assured S.L. he would try to spend as much time with her as possible, but would also need to allocate his attention among students in the group in order to "keep up appearances."

14

59.     One night while in Italy, Tarwater invited S.L. and four other students into his hotel room to watch a movie. During the movie, Tarwater invited S.L. to share a blanket and Tarwater began rubbing S.L.'s leg under the blanket.

60.     Later in Switzerland, Tarwater invited S.L. to meet in his room. After a lengthy discussion including about Tarwater's own personal problems through which he purported to identify and empathize with S.L., Tarwater gave S.L. a full frontal hug and while doing so lifted her off of the ground.

61.     On the last night Tarwater was present on the trip, Tarwater invited S.L. to his hotel room, where he professed romantic feelings her even though he "was not sure how it would work because of his wife and career."

62.     Despite his marriage and position, Tarwater professed to S.L. that he wanted to continue working out together and seeing one another whenever they had the opportunity.

63.     At Tarwater's request, S.L. helped him set up a Snapchat account, which would allow Tarwater to communicate with S.L. without leaving incriminating messages.[4] Tarwater then began communicating with S.L. exclusively by Snapchat.

64.     After returning from the trip in or about August 2016, Tarwater continued escalating his physical contacts with S.L. For example, after running Tarwater would grab S.L.'s butt when he was sure no one else was around.

65.     S.L. began her sophomore year of college in the fall of 2016.

66.     When S.L. was away at school, Tarwater's messaging via Snapchat quickly escalated to be nearly constant, even texting "good morning" and "good night" every day. The

---

4. Snapchat is a social media and messaging app primarily used for creating multimedia messages referred to as "snaps," which can consist of a photo or a short video, and can be edited to include filters and effects, text captions, and drawings. Private message photo snaps can be viewed for a user-specified length of time (1 to 10 seconds as determined by the sender) before they become inaccessible.

15

tone of Tarwater's messages became controlling and possessive; Tarwater sought to know what S.L. was doing at all times and if S.L. failed to respond to him promptly he would "blow up her phone" with messages demanding to know why. S.L.'s roommates observed her being oddly guarded of her phone and constantly exchanging texts, although she would not say with whom.

67. Tarwater also began steering conversations to sexual topics, including inquiring about masturbation and demanding that S.L. send nude pictures of herself. Although initially uncomfortable with the idea, S.L. eventually relented to Tarwater's demands. Once she began sending Tarwater pictures, he constantly asked for more. Tarwater later began sending her nude pictures of himself to S.L.

## THE SCHOOL BOARD PROMOTES
## TARWATER TO SUPERINTENDENT

68. In or about spring 2017, the School Board voted to promote Tarwater to Superintendent effective the start of the 2017-18 school year. At the same time, Kathy Butler, formerly the elementary school principal, was promoted to principal of LJHS where she was also designated as the Title IX Coordinator.

69. Once S.L. returned home in the summer 2017, Tarwater manipulated her into resuming workouts at Legacy Park. Tarwater told S.L. she needed to conceal these meetings from her parents, siblings and friends.

70. Despite ostensibly meeting to work out, Tarwater frequently invited S.L. to sit in his car for hours "talking." In reality, Tarwater used these interactions to manipulate S.L. emotionally and psychologically. For example, Tarwater regularly confided in S.L. about his purported struggles with anxiety/depression, and other purported problems in his personal life. Tarwater told S.L. he and his wife had relationship problems and did not sleep in the same bed. Tarwater bemoaned his wife was too good for him and should take the kids and leave him.

16

71.     Tarwater also began using these interactions to begin abusing S.L. sexually.  At one point, Tarwater announced to S.L. that he was "finally comfortable touching her," and began fondling her breasts and genitals under her clothes.  This behavior made S.L. herself uncomfortable but she did not feel she could resist.

72.     By this time, and as a result of Tarwater's years of inexorable predatory sexual grooming, S.L. had become emotionally isolated from her family, extremely depressed, anxious and deeply confused about the nature of her relationship with Tarwater.   Her perception of him as a "father figure" made her uncomfortable and dissociative because a romantic or sexual relationship with a "father figure" would be improper and, if that was the case, like most victims she was manipulated to believe the impropriety must be her fault.   Moreover, as a result of Tarwater's purposeful manipulation, S.L. began worrying about whether she might be responsible for damaging Tarwater's career or marriage if he was exposed.

73.     In fall of 2017, S.L. remained a full-time Northwest Missouri State student but traveled to Kailua-Kona, Hawaii for an internship.   By this time, Tarwater had successfully imposed himself as a constant fixture in her life for nearly four years.

74.     Also in the fall of 2017, K.P. was starting her junior year at LJHS.  Tarwater was by now grooming K.P. using the same "special treatment," personal attention and other predatory tactics he had used on S.L.; engaging her in frequent personal conversations, inviting her to confide details about her personal life, and gradually desensitizing her to touch through "side-hugs" and other forms of seemingly innocent contact from which Tarwater derived sexual gratification.

75.     Throughout the 2017–18 academic year, Tarwater continued daily messaging S.L. via Snapchat and planning their next meeting.  Snapchat remained Tarwater's primary means of communication until Tarwater told S.L. that his wife had discovered his account and was curious

17

why it showed so much activity (the app awards users "points" based on frequency of use). Tarwater told S.L. he had to delete his Snapchat account and they needed to begin communicating via direct messages on Instagram.

76.    Because Instagram lacked Snapchat's automatic delete function, Tarwater began to constantly demand S.L. delete all messages and pictures exchanged between them.

77.    Tarwater demanded S.L. meet him whenever she came home on breaks or weekends.  To avoid detection, Tarwater typically arranged to meet S.L. at Legacy Park on her way in or out of town.  Tarwater would park and then motion from his car when he wanted S.L. to approach and join him, so Tarwater could fondle her.

78.    Near the end of the school year, Tarwater told S.L. that he was in love with her. Subsequently, during a meeting in his car at Legacy Park, Tarwater kissed S.L. on the lips for the first time.  Afterward, Tarwater announced he had "been wanting to do that for a long time."

79.    In May 2018, S.L. turned 21 years old.

80.    In June 2018, Tarwater met S.L. in his car at a secluded location near Longview Lake, where he manipulated her into having sexual intercourse.  Because she had been subjected to years of predatory sexual grooming by Tarwater, beginning when she was a minor and a student in high school, under the circumstances, S.L. lacked the ability to consent.

**SECOND LONE JACK HIGH SCHOOL TRIP ABROAD**

81.    In July 2018, at Tarwater's insistence, S.L. once again attended the school-sponsored trip abroad.  As before, Tarwater announced his plan to spend as much time as possible with S.L. and her group without raising suspicions or jeopardizing his appearance as overall "trip

18

leader." However, early on in the trip, Tarwater reassigned the parent chaperone for S.L.'s group and appointed himself as S.L.'s group leader.

82.     During the trip, Tarwater demanded S.L. come to his hotel room every night; again, he manipulated her into having sexual intercourse.

83.     At one point during the trip, Tarwater told S.L. that some parent chaperones had voiced concerns and that they needed to be more careful.

84.     Nevertheless, Tarwater continued overtly testing boundaries. For example, while touring with S.L. and her group, Tarwater would furtively take S.L.'s hand or grab her butt.

85.     At one point, two LJSD Employees—Kim Howard (district payroll clerk) and Ken Howard (High School Phys Ed)—saw Tarwater take S.L.'s hand. S.L. asked Tarwater multiple times during and after the trip if either of the Howards said anything or raised suspicion; Tarwater assured they had not.

## THE FINAL YEAR OF ABUSE

86.     S.L. returned to Northwest Missouri State for her senior year in the fall of 2018. In his constant communications, Tarwater often confided in S.L. about confidential student and employee matters at Lone Jack schools. For instance, Tarwater confided in S.L. about plans to renovate the track facility before they were publicly announced. Tarwater also confided in S.L. about Dustin Darby, a teacher Tarwater wanted to fire but supposedly couldn't because of budget issues. Tarwater also confided in S.L. his intentions to fire teacher Lacey Bruner long before he informed Ms. Bruner she would be fired.

87.     In or about October 2018, Tarwater confided in S.L. that a "cafeteria worker" had complained to Kathy Butler that Tarwater's behavior toward a female student was inappropriate and made her (the complainant) feel uncomfortable. Tarwater also confided in S.L. that Kellie

19

Roth had informed him about the complaint, and he identified the female student as K.P. S.L. later learned from Tarwater that neither Butler nor any other appropriate person ever investigated the allegations or took any other steps in response.

88.     From time to time, S.L. would convince herself to end things with Tarwater. But whenever S.L. raised the idea, Tarwater would manipulate her by, for example, telling her how much he loved her, imploring her to continue their "relationship," and even threatening to commit suicide as a means of emotional blackmail to make S.L. feel as if she would be responsible for Tarwater's wife becoming a widow and his children fatherless.

89.     For example, during fall semester, a male Northwest Missouri State student asked S.L. out on a date. When Tarwater discovered this, he began inundating S.L. with messages accusing her of breaking his heart, claiming he was suicidal and so emotionally unstable that his wife wanted to take him to Two Rivers Psychiatric Hospital, and threatening that S.L. would not be able to live with the guilt of his wife being widowed and kids not having a father. At Tarwater's insistence, S.L. cut off all communication with the male student.

90.     By winter break, as a result of Tarwater's continuing abuse, S.L.'s relationships with her parents and siblings were so badly frayed that she only briefly returned home for Christmas. In the same time period, Tarwater arranged to rent a cabin to meet S.L. near Northwest Missouri State, ostensibly while traveling for LJSD business. Tarwater later arranged to meet S.L. at a skate park in Platte City, claiming he "had to see her."

91.     Upon information and belief, in or around January 2019, despite known concerns about Tarwater's behavior around students, School Board President Kellie Roth extended Tarwater's contract and increased his pay.

20

92.     In or around March of 2019, Tarwater arranged to meet S.L. at Love Coffee in Lee's Summit.  Tarwater was upset, and told S.L. he was having a bad day at work.

93.     Tarwater confided in S.L. that there had been another complaint.  Tarwater said Kathy Butler had approached him again, as six parents had made complaints about Tarwater's behavior with a group of senior students including K.P.

94.     Upon information and belief, the District again failed to investigate or take appropriate action with respect to the complaint.  Upon information and belief, Kathy Butler told Tarwater she did not want to have another discussion with Tarwater about his behavior with students, indicating Kathy Butler not only had actual notice of repeated concerns about Tarwater's conduct toward students but also that any prior remedial measures were inadequate and ineffective.

## THE INTERVENTION

95.     In early June 2019, S.L. returned home after college graduation.  By this time, S.L. was visibly distraught and completely withdrawn from family and friends.  S.L.'s step-mother confronted S.L. and demanded to know what was going on.  S.L. broke down and began to reveal the nature and extent of her interactions with Tarwater.

96.     On June 6, per her parents' demand, S.L. directed Tarwater to stop messaging her.

97.     In response, Tarwater called S.L.'s step-mother.  During that call, Tarwater admitted to having sex with S.L., and claimed he "never wanted this to happen."  Tarwater made clear that he did not intend to leave his wife, and promised he would leave S.L. alone if the situation was not made public.  Ominously, Tarwater also told S.L.'s step-mother he lived in fear of waking up to find his face on TV or "opening his front door to an angry dad," indicating Tarwater knew the scope of his wrongdoing and that S.L. was not his only victim.

21

98.     S.L., with the help of her parents and her therapist, began coming to terms with what had happened to her, and the manner in which Tarwater had abused her.

99.     Unfortunately, Tarwater did not leave S.L. alone but continued trying to communicate via social media with increasing desperation.   Tarwater also began regularly appearing in public places at the same time as S.L., observing and trying to approach her.

100.     On August 13, 2019, S.L. finally blocked Tarwater from calling and messaging her. Four days later he confronted her at a convenience store.

101.     On August 30, 2019, S.L. and her parents met with Lone Jack Police Chief William Forbes regarding Tarwater and her concerns that he would not leave her alone.

## S.L. COMES FORWARD TO STOP TARWATER

102.     Shortly after Labor Day, S.L. became concerned after noticing some social media postings of Tarwater, K.P. and another former LJHS student.  From her previous experiences with Tarwater, the social media posts sent up red flags to S.L., as she noticed some of the same things happening that Tarwater had done to manipulate her.  S.L. and her parents began reaching out to K.P.'s parents, in an effort to warn them and protect K.P.

103.     On September 9, 2019, S.L. and her parents met again with Lone Jack Police Chief William Forbes.  At the conclusion of the meeting, the Police Chief advised that wanted to go to the school board regarding S.L.'s concerns about Tarwater.

104.     On September 19, 2019, S.L. and her parents met with K.P.'s parents to discuss what had happened to S.L. and S.L.'s concerns that Tarwater was targeting K.P.

105.     On October 8, 2019, Tarwater called S.L.'s step-mother again.   Tarwater was distraught and unhinged.  Tarwater said he had just finished a meeting with LJSD School Board President Kellie Roth, who had warned him that S.L. was preparing to "come forward."

106.     Following her call with Tarwater, S.L.'s step-mother called Kellie Roth to inform that her family had not yet decided to come forward, but that there were other girls affected by Tarwater's behavior.  S.L.'s step-mother also expressed concern for the safety of her other children, S.L.'s younger siblings, who were still in class at the high school, given Tarwater's distraught and unhinged demeanor on their prior call.  In response, Kellie Roth assured her that Tarwater was "out of the district today."

107.     S.L.'s step-mother then contacted K.P.'s mother and S.L. to relay concern that Tarwater had been tipped off about a complaint by Roth, and might do something rash to K.P., S.L., or one of their younger siblings.

108.     In response, K.P.'s mother advised she had just been confronted by Tarwater, who demanded to know if she thought Tarwater was having sex with K.P., revealing to S.L.'s step-mother that Kellie Roth had lied to her, that Tarwater was not "out of the district," that Tarwater had in fact been tipped off, and Ms. Roth had already known there were other girls affected by Tarwater's behavior.

109.     S.L.'s step-mother immediately left work to remove her children from school and to safety.  Upon arrival, S.L.'s step-mother explained to Assistant Principal Jason Fenstermaker what Tarwater had done to S.L., and the circumstances that necessitated removing her kids from school that day.

110.     On October 9, 2019, the School Board held a special emergency meeting described as "Executive session to discuss personnel and legal matter . . . ."  Upon information and belief, Tarwater was placed on indefinite leave pending investigation.  As noted above, the District subsequently permitted Tarwater to resign and refuses to share its investigator's report or findings with S.L.

111. As S.L.'s and K.P's families have continued sharing their experiences, a disturbing pattern emerged in the way Tarwater interacted with both S.L. and K.P.:

- S.L. and K.P. are a similar "type" of girl. Both are attractive, athletic, well-liked, and high achievers. Additionally, they were close to the same age when Tarwater began showing interest in them.

- Tarwater spent an exorbitant amount of time alone with both S.L. and K.P., allowing them to miss class time in order to be alone with him. Both S.L. and K.P. indicated Tarwater portrayed himself as a father figure or "like a dad" to them, which is indicative of his efforts to establish trust with them. Furthermore, Tarwater persuaded S.L. to attend international trips with him and attempted to have K.P. do the same.

- S.L. and K.P. were both aware that Tarwater and a few others had real-time access to an extensive security camera system enabling surveillance of various areas around the school. The camera system showed the front office area outside of Tarwater's office.

- S.L. and K.P. both confirmed Tarwater would commiserate with them about anxiety/depression issues and would say that his wife didn't understand because she didn't deal with anxiety/depression herself.

- Tarwater told both S.L. and K.P. that he didn't sleep in the same bed as his wife, and that he had relationship problems with his wife. Over time he went from talking about his wife by name or by reference as "my wife" to simply saying "the wife" in order to trivialize her role in his life.

- Tarwater relayed his history as one of victimization to both S.L. and K.P.; for example, Tarwater claimed that: (a) he was accepted to Julliard but didn't go because of his high school girlfriend who later cheated on him; (b) he was kicked out of college because of a false charge of plagiarism; (c) his wife didn't love him or was too good for him because his pills didn't work or because he 'couldn't feel anything anymore' and that she should take the kids and leave him.

- Tarwater would often confide in both S.L. and K.P. about his own finances (e.g., how much he and his wife made, that his wife made more than him, how much money was in his personal bank account, how much student debt he had, whether he should/could buy cars or take expensive trips).

- Tarwater would often confide in both S.L. and K.P. about other students' problems, or other teachers, including his opinions and plans for disciplinary actions.

24

- Tarwater attempted to gain the trust of both S.L.'s and K.P.'s families by, for example, contacting them directly and attempting to prevent them from developing concerns about his behavior.

- The physical escalation seems to be identical with S.L. and K.P. Tarwater initiated touch with a side hug, which appears innocent and can be easily justified as a harmless and sincere gesture. Following the side hugs were the front hugs, which allowed Tarwater to initiate touch with additional parts of the girls' bodies and normalize the contact. Tarwater then progressed to massaging both girls' shoulders, and kissing both of their foreheads on the last day of school. Additionally, Tarwater engaged in conversations of an intimate and eventually sexual nature with both girls, asking questions about their dating relationships and sexual experiences, demonstrating his physical touching was all for the purpose of deriving sexual gratification.

112. Tarwater inflicted extreme psychological and emotional damage upon S.L. by his years of predatory sexual grooming, manipulation, and ultimately sexual abuse, seeking to control how S.L. thought, felt, acted, believed, and perceived the world around her, and causing deep shame, humiliation, self-blame, confusion, sadness and despair.

113. Tarwater effectively deprived S.L. of any resemblance of a normal high school or college experience, and inflicted enormous, long-lasting and potentially permanent harm that will affect S.L.'s self-image, personal relationships, and employment throughout her life.

## COUNT I
### (Violation of Title IX against Defendant LJSD)

114. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1-113 hereinabove.

115. The LJSD and LJHS are recipients of federal funding.

116. At all relevant times, Defendant Matthew Tarwater is and was an "appropriate person" with the authority and ability to address and end the discriminatory conduct alleged herein.

117. As an appropriate person, the School District is deemed to have actual knowledge of all complaints of discriminatory conduct of which Tarwater was aware.

25

118.    As an appropriate person, Tarwater had actual knowledge that S.L. was subject to sexual harassment, misconduct and abuse, for which he was also personally responsible.

119.    Tarwater had actual knowledge that he conduct he engaged in with respect to S.L. violated state and federal laws, School Board Policies, his ethical responsibility as an educator and Title IX itself.

120.    As an appropriate person, Tarwater had at a minimum an obligation to self-report his conduct to the District or other appropriate person and failed to do so.

121.    Upon information and belief, other high school staff and administrative personnel with the authority and ability to address and end the discriminatory conduct alleged herein, including but not limited to Kellie Roth and Kathy Butler, knew Tarwater's conduct violated School Board Policies designed to prevent sex discrimination and harassment, but nevertheless failed to take any action, much less any reasonable or appropriate action.

122.    The harassment alleged herein toward S.L. was severe, pervasive and objectively offensive.

123.    Upon information and belief, Tarwater engaged in similar unlawful behavior before being hired by the LJSD, which failed to exercise reasonable due diligence when deciding to employ him as an administrator and principal of LJHS.

124.    The harassment and sexual misconduct alleged herein deprived Plaintiff of access to the educational benefits and opportunities offered by LJHS.

125.    The harassment and sexual misconduct alleged herein occurred in the context of an education program or activity.

126.    LJSD and LJHS were deliberately indifferent to the harassment and discrimination alleged herein and Tarwater's continuing violation of Title IX by failing to adopt any policy or

26

implement any procedure sufficient to prevent him from abusing his position of authority or otherwise being held accountable for such conduct.

127. Defendant LJSD's policies and procedures for reporting, investigating and resolving claims of sexual harassment were inadequate or ineffective.

128. Defendant LJSD failed to offer adequate training to employees to recognize, report and investigate unlawful discrimination on the basis of sex and to prevent and police behaviors known to be associated with sexual grooming of students.

129. Defendant LJSD, by and through its employees and agents, had the duty to provide Plaintiff with a suitable education.

130. The aforesaid occurrences were the direct and proximate result of the negligence and carelessness of the LJSD's employees and agents while acting within the course and scope of the employment by the School District.

131. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages, including but not limited to severe emotional distress, psychological injury and trauma in addition to the costs associated with past and future medical and psychological treatment.

132. Due to Defendants' acts and omissions, Plaintiff has been diagnosed with depression, chronic anxiety and low self-esteem. These injuries are lasting and potentially life-long. Among other things, statistics show that students subjected to such misconduct often have difficulty forming healthy, lasting romantic relationships.

## COUNT II
### (Section 1983 Due Process Violation against LJSD and Tarwater)

133. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1-132 hereinabove.

134.    Plaintiff asserts this claim under 42 U.S.C. § 1983 for violation of her federally protected constitutional right to bodily integrity under the Due Process Clause of the United States Constitution.

135.    Plaintiff is a citizen of the United States of America.

136.    Defendant Tarwater is a person subject to liability pursuant to 42 U.S.C. § 1983. At all relevant times, Tarwater was a district official with final policymaking authority with respect to the subject matters alleged herein and his acts and omissions constitute official policy and practice of the District.

137.    Defendant LJSD is a person under 42 U.S.C. § 1983 and is responsible for all official conduct by Defendant Tarwater and other agents and employees of the district.

138.    As alleged herein, all conduct by Defendants occurred under color of state law.

139.    Plaintiff has a constitutional right pursuant to the Fourteenth Amendment to the U.S. Constitution to Equal Protection of the laws and substantive and procedural due process.

140.    Plaintiff further has a protected property right to education which cannot be denied arbitrarily and capriciously or without due process of law.

141.    Plaintiff has a constitutionally protected liberty interest to be from sexual abuse in public schools and in any education program or activity receiving federal funds.

142.    Plaintiff has a constitutionally protected interest to be free from arbitrary and capricious actions that stigmatize her and create or disseminate a defamatory impression regarding her conduct.

143.    The course of sexual harassment and misconduct alleged herein deprived Plaintiff of her the constitutionally and federally protected rights enumerated above.

144.     Defendant Matthew Tarwater, in his official and personal capacity, was directly responsible for the constitutional deprivation alleged herein and through his own individual actions violated Plaintiff's constitutionally and federally protected rights enumerated above.

145.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages, including but not limited to emotional distress, psychological injury and trauma in addition to past and future expenses for necessary medical and psychological treatment.

146.     Due to Defendants' acts and omissions alleged herein, Plaintiff has been diagnosed with depression, chronic anxiety and low self-esteem.  These injuries are lasting and potentially life-long.  They will also more likely than not affect Plaintiff's ability to form healthy, lasting romantic relationships.

147.     Defendants' acts and omissions as alleged herein were willful, wanton and malicious, and done with reckless indifference to Plaintiff's federally protected rights, entitling her to punitive damages against Defendant Mathew Tarwater individually and in his personal capacity.

### COUNT III
### (Section 1983 Equal Protection against LJSD and Tarwater)

148.     Plaintiff incorporate by reference the allegations set forth in Paragraphs 1-147 hereinabove.

149.     Plaintiff asserts this claim under 42 U.S.C. § 1983 for violation of her federally protected constitutional rights under the Equal Protection Clause of the United States Constitution.

150.     Defendant Tarwater is a person subject to liability pursuant to 42 U.S.C. § 1983. At all relevant times, Tarwater was a district official with final policymaking authority with respect to the subject matters alleged herein and his acts and omissions constitute official policy and practice of the District.

151.    Defendant LJSD is a person under 42 U.S.C. § 1983 and is responsible for all official conduct by Defendant Tarwater and other agents and employees of the district.

152.    As alleged herein, all conduct by Defendants occurred under color of state law.

153.    Plaintiff has a constitutional right pursuant to the Fourteenth Amendment to the U.S. Constitution to Equal Protection of the laws.

154.    Plaintiff is an individual and member of a protected class under the Fourteenth Amendment.

155.    The course of sexual harassment and misconduct alleged herein was based on Plaintiff's gender and deprived her of the constitutionally and federally protected rights enumerated above.

156.    Defendants' acts and omissions described above were willful, wanton and malicious, and done with reckless indifference to Plaintiff's federally protected rights, entitling her to punitive damages against Defendant Mathew Tarwater, who through actions taken in his individual capacity, was personally responsible for the constitutional deprivations alleged herein.

157.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages, including but not limited to emotional distress, psychological injury and trauma in addition to past and future expenses for necessary medical and psychological treatment.

158.    Due to Defendants' acts and omissions, Plaintiff has been diagnosed with depression, chronic anxiety and low self-esteem. These injuries are lasting and potentially life-long. They will also more likely than not affect Plaintiff's ability to form healthy, lasting romantic relationships.

159.    Defendants' deprivation of Plaintiff's federal rights as described above is willful, wanton and malicious entitling Plaintiff to punitive damages against Defendant Tarwater.

<u>**COUNT IV**</u>
**(Intentional Infliction of Emotional Distress against Defendant Tarwater)**

160.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1-159 hereinabove.

161.    Plaintiff asserts this claim under the laws of Missouri for the intentional infliction of emotional distress against Defendant Tarwater.

162.    The acts and conduct of Defendant Tarwater as set forth above was extreme and outrageous.

163.    Defendant Tarwater intended to cause, or was in reckless disregard of the probability that his conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

164.    As a direct and proximate result of Defendant Tarwater's wrongful conduct, Plaintiff has suffered damages, including but not limited to emotional distress, psychological injury and trauma.

165.    Defendants' conduct as described above is willful, wanton and malicious entitling Plaintiff to punitive damages against the Tarwater.

<u>**COUNT V**</u>
**(Negligent Retention / Supervision against LJSD)**

166.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1-165 hereinabove.

167.    LJSD hired and retained Tarwater to work at LJHS.

168.    LJSD had a duty when retaining employees to exercise care used by reasonable and/or careful school districts, high schools or school boards to continually assess an employee's

31

suitability for his position, including but not limited to observing the employee's interaction with students, and collecting, investigating, and responding to any complaints about the employee.

169.    A reasonable and careful school district, high school and school board would have recognized that an employee that conducted himself as Tarwater did posed a danger to the students, and would have terminated Tarwater's employment and otherwise taken action against the danger he posed to students.

170.    Prior to and during the time Tarwater was grooming, harassing, preying upon, and abusing his power over S.L., LJSD knew or should have known that Tarwater posed an unreasonable risk of harm to female students and that he had a propensity for sexual harassment and misconduct.  Nonetheless, LJSD retained and promoted him as principal and superintendent.

171.    LJSD's negligence in the retention of Tarwater created a forseeable risk of harm to students in the school where Tarwater worked, and those attending school-sponsored trips, in particular female students including S.L.

172.    As a direct and proximate result of LJSD's negligent retention, Plaintiff suffered damages, including but not limited to emotional distress, diagnosable and medically significant psychological injury and trauma.

173.    Defendants' conduct as described above is willful, wanton and malicious entitling Plaintiff to punitive damages against Defendants.

**COUNT VI**
**(Negligent Inflection of Emotional Distress against LJSD)**

174.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1-173 hereinabove.

175.    Plaintiff asserts this claim under the laws of Missouri for negligent infliction of emotional distress against Defendant LJSD.

32

176.    Upon information and belief, the District maintains insurance that covers common law tort claims, and therefore has waived its immunity under Mo. Rev. Stat. 537.610 for the specific purpose of and to the extent of its insurance coverage.

177.    Defendant owed Plaintiff a legal duty to protect her from the injuries as alleged herein.

178.    Defendant breached of its duty of care in failing to prevent Defendant Tarwater's wrongful conduct.

179.    Defendant knew or should have known that Tarwater's conduct involved an unreasonable risk of Plaintiff causing distress.

180.    As a direct and proximate result of Defendant's negligence, Plaintiff suffered damages, including but not limited to emotional distress, diagnosable and medically significant psychological injury and trauma.

181.    Defendants' conduct as described above is willful, wanton and malicious entitling Plaintiff to punitive damages against Defendants.

WHEREFORE, Plaintiff prays that this Court conduct a jury trial on her claim, enter judgment in her favor and against Defendants as follows:

A.    For compensatory damages in whatever amount may be proven at trial under federal and state law;

B.    For punitive damages against Defendant Tarwater in an amount to be proven at trial;

C.    For pre- and post-judgment interest as allowed by law;

D.    For reasonable attorneys' fees, including non-taxable litigation expenses;

E.    For costs of suit; and

F.     For such further other relief as the Court may deem just, proper and appropriate.

## **JURY DEMAND**

S.L. hereby requests a jury trial on all issues to triable.

Respectfully submitted,

McDOWELL, RICE, SMITH & BUCHANAN, PC

*/s/ Adam J. Gasper*
William C. Odle, MO Bar #38571
Adam J. Gasper, MO Bar #61168
605 W. 47th Street, Suite 350
Kansas City, MO 64112
(816) 753-5400 telephone
(816) 753-9996 facsimile
wodle@mcdowellrice.com
agasper@mcdowellrice.com

ATTORNEYS FOR PLAINTIFF